# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1913.

---

## SALLIE E. DONALDSON, Appellant, v. MACE DONALDSON et al.

In Banc, April 8, 1913.

1. **BILL OF EXCEPTIONS: No Motion for New Trial: Amendment: Accepted in Division.** Where, notwithstanding the abstract as originally filed showed no motion for a new trial or a call for one as a part of the bill of exceptions, appellant tendered an amended abstract showing such motion as a part of the bill, while the case was pending in division, and the judges of that division took cognizance of the amended abstract, and both appellant and respondent filed amended briefs after the case was transferred to Court In Banc, the court will *ex gratia* pass over the technicality of an imperfect abstract.

2. **MARRIAGE CONTRACT: Fraud: Cancellation: Divorce as Bar.** A decree of divorce obtained by the husband, after a marriage contract by which certain money was to be given to the wife in lieu of dower and homestead, alleged to be the product of fraud, and after he had deeded the land to certain sons in pursuance to that contract, it being alleged that the conveyance was a part of the fraudulent scheme, presents an insuperable barrier in the way of any right she may once have had to have such contract annulled for fraud and to have the conveyance set aside. The decree of divorce, *ipso facto*, forfeited her dower, homestead and all her other marital rights; and along with them, went her incidental right to complain of

(228)

fraud practiced upon her in the procurance of the contract and deed by which her prospective dower and homestead in his estate were surrendered and disposed of.

3. **DIVORCE: Subsequent Rights of Wife.** Our statutes recognize but one form of divorce and that one *a vinculo*—an absolute severance of the bonds of matrimony; and by virtue of an express statute a divorce in favor of the husband for the wife's fault cuts off the marital rights of the wife, *ipso facto*, fully, instantly and forever as to the marriage dissolved.

4. ————: ————: ————: ————: **Innocent Party.** The wife will not be heard to contend that she had a meritorious defense in the divorce case. The time to have made that defense was in that case, and the decree, so long as it stands, forever puts an end to that contention. It became *res adjudicata;* that is, a complete bar to future action.

5. ————: **Remarriage: Fraud During First Marriage.** Nor does the fact that she and her husband, after the divorce, married again, help her in attacking, as fraudulent, the contract made prior to the first marriage, whereby, for a monetary consideration, she agreed to and afterwards did release her claim to dower and homestead. The divorce decree obtained by the husband put an end to her right to dower or homestead under the first marriage.

6. ————: **Fraudulent Contract in Lieu of Dower: Incident to Marital Relation.** The wife's right to complain of frauds practiced upon her by her husband in obtaining from her a contract whereby she surrendered her homestead and dower, and in pursuance to which she executed a deed conveying his lands, was but an incident to the then marital relation, and when that principal thing was afterwards destroyed by a decree of divorce, obtained by him, for her fault, the incident went with the principal. The maxim is: The incidents of a thing follow tacitly.

7. **DOWER: Deed During Marriage: Divorce: Subsequent Remarriage.** If during the first marriage the wife joined her husband in a voluntary deed to his sons, reserving to himself a life·estate, and that deed was delivered, and thereafter he obtained a divorce for her fault, her subsequent marriage to him a second time did not invest her with dower in the lands so conveyed, for he had only a life estate and was not "seized of an estate of inheritance, at any time during the marriage"— an essential element in the widow's dower; and the divorce having been obtained by him for her fault, it maters not that the deed was a result of fraud practiced on her by him.

8. **ANTENUPTIAL CONTRACT: Fiduciary Relation: Burden.** The relation of a man to a woman he is about to marry is a

confidential one in an exacting and stringent sense; and he carries the burden of showing that any *ante*-nuptial contract entered into between them by which she surrendered her dower, homestead or other marital right, made under the glow and trust of that relation, was made fairly and understandingly, upon full disclosures, and is just and adequate. That rule in this case is applied to a contract entered into by a woman and her husband upon the eve of a second marriage after they had been previously divorced.

Appeal from Clay Circuit Court.—*Hon. Francis H. Trimble,* Judge.

AFFIRMED.

*T. A. Frank Jones, Joseph S. Rust* and *D. C. Allen* for appellant.

(1)   The marriage contracts were both void for inadequacy of consideration, and because on their faces they only provided for her during his life. For the latter reason they were void as against public policy. Móran v. Stewart, 173 Mo. 207; Mowser v. Mowser, 87 Mo. 437. (2) In view of the relationship of the parties, the undue influence, want of adequate consideration, and the circumstances surrounding the pretended execution and delivery of the deed, want of advice or counsel on the part of the wife, the fact that a will had been the intention, the fact that the deed was not recorded until after the death of the grantor, and that until then it remained either in the possession of plaintiff or his attorneys, for about six years, the admission of the grantor's lawyers, now respondents' lawyers, and other like circumstances, together with the positive evidence of appellant, a court of equity will presume fraud and cast the burden upon these respondents. State ex rel. v. Merritt, 70 Mo. 276; Bump on Fraudulent Conveyances, secs. 31-61; Kerr on Fraud and Mistake, 143; Caldwallader v. West, 48 Mo. 483; 20 Cyc. 450; Miller v. Sullivan, 11 Mo. App. 425; Garvin v. Williams, 44 Mo. 473. (3) Respondents having been cognizant of all which took

place cannot now profit by their own wrong. (4) The fraudulent purpose being established and presumed because of the circumstances, the fraud is presumed to attach to everything which was done and which was necessary to the consummation of the fraud, even to the divorce; and respondents cannot plead or use that divorce as a means of effecting the fraud. Caldwallader v. West, supra. (5) The rule that fraud vitiates everything cannot be so modified as to read "fraud vitiates everything unless it is perpetrated through the instrumentality of a divorce." If a court of equity will not allow a positive statute to be used in the perpetration of a fraud, will it allow a divorce, at best a necessary evil, to do so? (6) Such transactions as the one disclosed by the case at bar are by a court of equity presumed to be fraudulent and void and the fraudulent purpose being established a court of equity will not allow it to be consummated by any means whatever. Caldwallader v. West, 48 Mo. 493, and cases above cited. (7) *Fraus est celare fraudem.* 'Tis fraud to conceal a fraud. Without reference to the actual fraud in the execution of the deed in controversy, the keeping of it from record for six and one-third years, and the concealment of its tenor and effect, were a palpable fraud on appellant. This necessarily influenced her action on receipt of decedent's letter to her on May 23, 1902. Concealment of fraud is particularly odious in law in marriage negotiations or settlements where the interests of a spouse are in any way affected. Peyton v. Bladwell, 1 Vernon, 240; Gale v. Lindo, 1 Vernon, 475; Turton v. Benson, 1 Peere-Williams, 496; Randall v. Willis, 5 Vesey, Jr., 262; Pomeroy's Equity (2 Ed.), sec. 931; Broom's Legal Maxims (3 Ed.), p. 16. And what is true of the deed in controversy is true of the deed of July 25, 1898. The respondents failed to show in evidence that the deed in controversy was so explained to appellant that she thoroughly knew and understood that she was,

in signing the deed in controversy, forever releasing her dower and homestead in the land and all claims on decedent's personalty. If there is any doubt of this, she is entitled to the full benefit. (8) Even if there were no intentional fraud on appellant in the marriage contracts or the deed in controversy, yet, in law, the three instruments were against the policy of law and were frauds in law upon her. The reason is plain: They were contracts on settlements in the nature of jointures. At the time of both marriages, decedent was a wealthy man—quite wealthy. From all of the authorities, the provision for the wife must be adequate —something in proportion to his wealth. 2 Scribner on Dower (2 Ed.), p. 389; Mowser v. Mowser, 87 Mo. 437; Farris v. Coleman, 103 Mo. 352; Moran v. Stewart, 173 Mo. 207; King v. King, 99 Mo. 106; Logan v. Phillips, 18 Mo. 22; Sec. 2950, R. S. 1899. The provision under the first marriage contract was $500, under the second $100, and under the deed in controversy, nothing! Can it be possible that such a result is legal? Surely not. It is in the very teeth of section 2950. (9) The respondents rely much on the effect of the decree in the divorce suit. Was not remarriage, on decedent's own motion, a complete resumption of original conditions? Was not decedent, and are not his heirs, estopped from taking the benefit of the concealment and fraud of the two deeds—of July 25, 1898, and May 15, 1900? Two of the great maxims of the law are *Nullus commodum capere potest de injuria sua propria* and *Nemo ex proprio dolo consequitur actionem*. No man shall take advantage of his own wrong. No man shall prosecute an action arising from his own fraud. The same maxims apply, of course, to defenses. Broom's Legal Maxims (3 Ed. Am.), pp. 209, 221; Moran v. Stewart, 173 Mo. 207.

*William J. Courtney* and *Sandusky & Sandusky* for respondents.

(1) In a voluntary deed from a parent to a child

there is no presumption of fraud. Doherty v. Noble, 138 Mo. 25; Bruner v. Bruner, 115 Ill. 40. (2) The testimony of a married woman is not, alone, sufficient to overcome her signature and the official certificate of acknowledgment. Biggers v. House Bldg. Co., 9 Mo. App. 210; Barrett v. Davis, 104 Mo. 555; Mays v. Pryce, 95 Mo. 603; Eng. & Thresher Co. v. Donovan, 147 Mo. 633. (3) The divorce granted to Robert H. Donaldson on November 12, 1901, cut out all marital rights of appellant in his property. R. S. 1909, sec. 2378. When they remarried on May 28, 1902, her marital rights then accrued as to all property then owned by Robert H. Donaldson; at that date he owned only a life estate in the lands in controversy, which fact appellant then well knew, and the decree so finds. (4) If fraud in fact were established in the execution of the deed dated May 15, 1900, the deed was, nevertheless, binding on Robert H. Donaldson and his heirs in favor of Walter and Mace. Ober v. Howard, 11 Mo. 425; Stevenson v. Edwards, 98 Mo. 622; Whithed v. Mallory,.4 Cush. 138. And when the decree for divorce cut out appellant there was no one left to question the validity of the deed. Gross v. Lange, 70 Mo. 45.

LAMM, C. J.—Plaintiff, now the widow of, twice married to and once divorced from, Robert H. Donaldson, sued in two counts—one in equity, one at law. Defendants are the children of said Robert by a former marriage. Full of years, to-wit, three score and seven, he died testate in Clay county in September, 1906, but his will disposed of personalty, hence its terms, undisclosed, seem immaterial.

The object of the first count was to set aside two marriage .contracts between her and Robert, because of. inadequacy of provision and fraud, and to avoid a certain conveyance of all his real estate made, during the term of his first marriage to plaintiff, by Robert to his two younger sons, Mace and Walter, for fraud,

as standing in the way of her marital rights as widow, and for non-delivery. The second count was for the admeasurement and assignment of dower in the land so conveyed to Mace and Walter and to set off her homestead therein, proceeding on the theory that Robert died seized of the land.

From a decree annulling the second marriage contract for inadequacy of provision for the wife, but refusing to set aside the conveyance and passing by the first marriage contract *sub silentio,* plaintiff appeals. Defendants abided the decree.

The first count is an elaborate bill in forty-one paragraphs. It sufficiency as a pleading is not questioned, hence its reproduction is useless. As plaintiff's own testimony and that of her witnesses tended to sustain some of its allegations, an outline of its charges may aid in understanding the controversy. Summarized it charges that on August 31, 1899, Robert was the owner of a considerable estate; was sixty-nine years of age and contemplated a marriage with plaintiff, then fifty-nine years old; that he made a marriage contract with her (verbal we infer) whereby in addition to plaintiff's proper support during her life a promise was made of $3000 in cash to be paid her at his death and, in that event, to secure to her the use of the mansion house on his farm with one-third of his real estate during her life, she to be taken care of by Mace, one of his sons; that in the October following, in pursuance of this agreement to marry made on the terms stated, they were married; that through the fraudulent contrivance of said Robert to defeat her marital rights (in which he was aided, abetted and influenced by his two sons, Mace and Walter, and his nephew John T. Donaldson) she was induced to sign and acknowledge a fraudulent marriage contract grossly inadequate in provision, she being at the time without business experience and without counsel and said Robert being at the time in a confidential and

fiduciary relation to her by virtue of their marriage engagement and implicitly trusted by her. Said contract bound her to receive at his death $500 in lieu of all support, maintenance and property rights as his widow, including dower and homestead; that she did not read over the contract, but was falsely assured it contained the provisions heretofore stated for $3000, her widow's third and residence in the family mansion, etc. That the influence of said sons and nephew on Robert was accentuated and made easy by the fact that he was, and had long been, a hard drinker and his will power was thereby impaired and made subservient to the wills of said sons and nephew; that after the marriage in furtherance of the scheme to defraud her out of her marital rights, she, when without counsel, was fraudulently persuaded to sign and acknowledge a deed in May, 1900, for a consideration of one dollar, whereby Robert (reserving to himself a life estate) conveyed to his said two sons, Mace and Walter, all his real estate. It is averred that said deed was never delivered; that it was procured under circumstances of fraud and surprise (set forth at great length in the bill) and signed and acknowledged by her without knowing of its true contents, purport or effect; that it was read over to her as if it contained the $3000 provision and that relating to her widow's third heretofore referred to. It is next alleged that after living with him from October, 1899, to August, 1900, she separated from him because of "revolting surroundings;" that in September, 1901, Robert sued her for a divorce; that she appeared to the action and filed an answer and (though she had a meritorious defense) through the advice of her attorneys she made no serious contest; that she was allowed $100 alimony *pendente lite* and that on December 12, 1901, a decree of divorce was rendered in his favor and against her. That on May 28, 1902, a remarriage between her and Robert was in contemplation; that at that time in con-

sideration of the second marriage he promised her the same provision promised in consideration of the first; that on the strength of that promise they were married the second time; that at that time, under the same circumstances as in the first, she was defrauded into signing another marriage contract allowing her $100 in lieu of all support and property rights in case she became his widow, and thereafter she lived with Robert as his lawful wife until his death.

(*Note*: The testimony does not sustain this last allegation. *Contra,* having deserted her husband in the first marriage venture in eight months or so, she deserted him in the second two years before his death.)

The second count is of no significance until the merits on the first count are disposed of; for if she is entitled to a full decree on the first count her right to dower and homestead goes as of course on the second. If not, the second is in the air.

The answer admits the two marriages, the intermediate divorce, the two written marriage contracts and specifically denies the charges of fraud, collusion, undue influence or the impairment of will power in Robert H. Donaldson at the times in hand. It stresses the divorce of Robert from plaintiff as a bar to the relief asked on the first marriage contract and deed, and affirmatively makes allegations contrary to the specifications of wrongdoing in the bill.

The reply reiterates the charges in the petition and denies the affirmative matter in the answer.

It should be said there were four amended petitions filed. We are told that to the first, three of the defendants, William, James L. and Emma, answered, admitting its allegations—what those allegations were we are not told. After that answer, those three stood mute on the pleadings, making no answer to the fourth amended petition. The trial answer was a joint one by defendants, Mace, Walter, Charles and Jefferson. Defendant Thomas E. filed no answer at any time.

So much for the pleadings.

The testimony took a wide range on both sides. As we read the record, at no time was plaintiff's competency as a witness sufficiently challenged to raise such question on appeal, as respondent does. That view of the matter is put to one side. Her own testimony tended to sustain the original verbal promise alleged to have been made by Robert H. Donaldson relating to the provision she was to have in consideration of her first marriage. She testified to her confidence and trust in him and to her acting without counsel. In the state of the proof before us the cause must proceed as if her testimony in that behalf was true. She also testified to her not reading the first marriage contract or any of the other instruments assailed and that each of them was read to her as if the alleged original verbal promise of $3000 and her widow's third in case of her surviving her husband, was actually in each instrument, and that she acted on false assurances in that regard. In relation to false assurances of the contents of the contracts and deed and a misreading of them, or any of them, to her when she signed and acknowledged them, her testimony is not only uncorroborated, but it is overwhelmed by the facts and testimony to the contrary. No chancellor could base a decree on her testimony on that phase of the case. That John T. Donaldson was the trusted adviser of the old gentleman seems to be established, but there is no testimony worth while or circumstances showing that he advised or influenced him to take the course he did in making the contracts or conveyance so as to deal harshly with plaintiff. That Robert H. Donaldson for a long time drank too heavily for his own or his sons' good, and this during the lifetime of his first wife, as well as during both his marriage ventures with plaintiff, is abundantly shown, but it is not satisfactorily shown that the use of liquor lowered his will power. To the contrary it appears that (in or out

of liquor) he was dogmatic, stubborn, heady and pragmatical to a degree.  On this behalf we take the credible testimony pertinent to the concrete case as we find it, eschewing the generalizations and theorizing of the witnesses.  To theorize on the effect of the use of whisky on the will power of men generally, depends too much on the extent of the use, the individual man (and, it may be, the quality of the liquor) to be of value in deciding this case.  The case cannot be permitted to break on a philosophical view of some moot point in physiology or psychology.  Peradventure drinking makes some men surly, ugly, unaccommodating and obstinate; some mellow, merry and yielding; some vivacious and witty; some stupid and sodden; and, since the days of Noah to this very day, all men the worse off in the long run.  [Proverbs, xxiii: 29-32, *q. v.*]  We leave this phase of the case by pointing out plaintiff's proneness to give highly colored and incredible testimony on drinking as in some other particulars.  Thus, she puts herself in the attitude of marrying Mr. Donaldson the second time on the credit of a remark or "promise" he made to her about whisky drinking. What was it?  A promise to leave off drinking?  No. Attend to it:

"Q.  Before the second marriage, what promise did he make with regard to how he would conduct himself, respecting whisky?  A.  He told me he was a strict member of the Presbyterian church, and *never drank a drop of whisky in his life.*

"Q.  Under those conditions you married again and signed the second contract?  A.  Yes, sir."

Nor is there testimony that would persuade a chancellor that the deed or either of the contracts was the product of the influence of the younger sons, Mace and Walter.  Whatever was done was as he wished it done and done on legal advice.

Defendants introduced testimony, much of it uncontradicted, tending to show that more than a year

before marriage was contemplated between plaintiff
and Mr. Donaldson the first time, and *without any re-
gard to a marriage,* the latter (then an old man) had
formed a plan for the settlement of his affairs. He
had made advancements to his other children. His
two younger sons had remained with him until middle
life, unmarried and working for him, and sitting as a
chancellor in the equities of his family affairs and the
merits of his children, he had then determined to give
his two younger sons his home farm (the land in
question), reserving a life estate in himself, and give
his other children no more of his estate. To that end
at that time, unknown to any of them, so far as this
record discloses, he signed and acknowledged a deed
to all his land conveying it to his said two sons and
deposited it with a bank to be delivered to them at his
death. That deed was never delivered to the grantees.
but was produced at the trial. If it had been placed
by him beyond his dominion and control when deliv-
ered to the bank, our case might have fallen within
the doctrine of Williams v. Latham, 113 Mo. l. c. 174,
and Cook v. Newby, 213 Mo. l. c. 489, et seq., and the
delivery might have been held sufficient and the con-
veyance operative to vest title, reserving a life es-
tate in the grantor. This, of course, on the theory it
was not made in contemplation of his approaching
marriage. But such is not our case, which hinges on
another deed. There was other testimony on the one
hand tending to impeach, and on the other tending to
show, the good faith of grantor in the deed assailed,
a second one, made a few months after his first mar-
riage with plaintiff, and much tending to show the in-
formation and understanding of plaintiff in regard to
it, and her acquiescing fully in carrying out the known
and long settled policy of her husband in conveying
the land to the two younger sons, this despite her own
testimony to the contrary. But for reasons presently

appearing it is not necessary to determine the efficacy of this testimony *pro* or *con*.

Any other facts essential to an understanding of the transactions in review, and to a just disposition of this appeal, will appear further on in the course of the opinion.

Stated in our own way the questions here are these:

(1)    Is there a fatal infirmity in the abstract of the bill of exceptions precluding an investigation and determination of the merits?

(2)    Assuming for the present the deed challenged was delivered, does the divorce in 1901, after the deed and first marriage contract were made, in which divorce Robert was the injured and innocent party, present an insuperable barrier in the way of any right she may have once had to set aside the conveyance made during that marriage for fraud, if any, practiced upon her marital rights? Or the first marriage contract for fraud or inadequacy of provision?

(3)    Was there such delivery of that deed as made it operative as a conveyance?

It is apparent that if the second question be answered against plaintiff, then, a sifting and weighing of the testimony relating to fraud upon her in the procurement of the deed is unnecessary. It is also apparent that if that question be answered against her, a determination one way or the other of the invalidity of her first marriage contract is not necessary. It is also apparent that if the deed was never delivered, then the decree avoiding the second marriage contract opened the door wide to the assignment of dower and setting off a homestead regardless of fraud. Hence in that view of it fraud is immaterial, and the decree denying her dower and homestead was wrong. It is also apparent that if the deed was delivered and the divorce precludes her questioning it on the score of working fraud upon her at that time, then all the chan-

cellor could do in granting relief he did by cancelling the second marriage contract.

Of the foregoing questions in their order.

## I. *Of the defect in the abstract.*

Appellant files an abstract on its face purporting to be a full copy of the bill of exceptions from caption to signature of judge. In that bill there is no motion for a new trial, no call for one and no exception to overruling one. Elsewhere in the abstract such motion appears, the order overruling it appears and in connection with that order (apparently in the wrong place, viz., a record entry) appears an exception. If the bill had called for the motion, then, if it had appeared elsewhere, we would be confronted with the proposition that a motion to be read only once by us need not be printed twice. In such condition the proviso to section 2083 (R. S. 1909) might have cured the defect of the absence of the motion in the bill, but absent a call in the bill for the motion that proviso is not applicable. Having then a case in which the bill as originally abstracted has neither a call for the motion, nor the motion itself nor an exception to overruling it, if we applied the doctrine of a line of cases, that pretermission would be such a fatal infirmity that the merits would not be here for review, and nothing but the record proper would be before us. But in this case appellant tendered an amended abstract while the case was in Division Two, showing that, as part of the original bill of exceptions, the motion for new trial as well as the exception to overruling it appeared therein. Our brethren of that Division took cognizance of the abstract as thus amended and both respondent and appellant filed additional briefs since the case was transferred to Banc. Since those briefs, as well as former ones, are on the merits, and since respondent does not question the verity of the amended abstract,

we are disinclined *In Banc* (not *ex debito* but *ex gratia*) to let the case break on the technicality that the original abstract was imperfect where, as here, the truth has been brought up by a timely amendment and has received the attention of one Division of this court in a case holding in judgment a question of dower and homestead to a widow.   Such course is not without precedent.

Accordingly respondent's point in that behalf is disallowed.

II.  *Of the divorce.*

The case turns in vital features on the determination of the effect on plaintiff's marital rights of the decree of divorce obtained by Robert H. Donaldson. Attending to the second question, we are of opinion it must be answered against plaintiff.   This, because:

(a)    Our statute recognizes but one form of divorce and that one *a vinculo*—one "from the bonds of matrimony," that is, an absolute one.   [R. S. 1909, sec. 2370.]   Whatever the common law may be as to the rights of a wife in a mere divorce from bed-and-board or whatever the statutes may be in some States, in this jurisdiction by virtue of express statute a divorce by a husband for the wife's fault cuts off the marital rights of the wife, *ipso facto,* fully, instantly and forever as to the marriage dissolved.   "In all cases of divorce from the bonds of matrimony, the guilty party shall forfeit all rights and claims under and by virtue of the marriage."   [R. S. 1909, sec. 2378.]   "If any woman be divorced from her husband, for the fault or misconduct of said husband, she shall not thereby lose her dower; but if the husband be divorced from the wife, for her fault or misconduct she shall not be endowed."   [R. S. 1909, sec. 359.]

Whatever the powerful and elastic function of equity, we are not at liberty to add a *jot* to or abate a

*Forfeiture of Marital Rights.*

*tittle* from the plain intent of those two statutes by construction to meet a supposed hard case. *Ita lex scripta est.* Where the meaning of the. lawmaker, as evidence by his words, is plain, there is no room for judicial construction. Now, the meaning of those two statutes is obvious, they stand on their own reason and must be enforced as written. That the quoted statutes do not apply where property is settled on the wife as a jointure, except in cases of adultery (Saunders v. Saunders, 144 Mo. 482; Leavy v. Cook, 171 Mo. 292), does not help plaintiff, for there is no jointure here and no vested estate.

(b) It will not do to hoot away the legal effect of that divorce or impair it by innuendo. As the writer said in another case, it will not do to *think* as a court behind the judgment when we may not *go* behind it. [Walther v. Null, 233 Mo. 1. c. 112.] Vehemence may possibly fill a modest office in briefs in this court, as elsewhere in life, when kept within strait bounds. For instance in that part of the Apocrypha known as the History of Bel and the Dragon (*q. v.*), we are told the Angel took Habak-kuk by his crown and bore him to Daniel by the hair of his head through the "vehemency of his spirit," whereby Daniel got a dinner on a notable occasion familiar to the Bar. But the vehemency of learned counsel in characterizing the divorce in question as a fraud must go for naught. For all purposes of the law that decree settled for all time the merits of that divorce suit. Thereby it was determined that this plaintiff deserted her then spouse without cause for the statutory time; that he was the injured and innocent party, that plaintiff was the guilty party in breaching the bonds of matrimony and that those bonds were dissolved once for all. That decree is *res judicata.* *Res judicata* rigidly applied (as it must be) and in full vigor, as here, has a prodigious potency in jurisprudence. It makes of white, black; of black,

*Merits of Divorce Suit.*

white; of the crooked, straight; of the straight, crooked.

"For it is a maxim that *res judicata,* or the decision of a legal or equitable issue by a competent jurisdiction, is a complete bar to any future action; *res judicata facit ex albo nigrum, ex nigro album, ex curvo rectum, ex recto curvum.*" [1 Bouv. Inst., sec. 840.] *Res judicata* is estoppel by record. It is as a plea, a bar, or as evidence conclusive between the same parties. [Womach v. St. Joseph, 201 Mo. l. c. 480.]

It is vain, then, for learned counsel to argue that she had a meritorious defense to that action; that she left him because of his (and not her) fault; that the divorce is but an "incident" in a linked and drawn out scheme of fraud on the part of Robert H. Donaldson and is to be treated as a part of a fraud heading to a defeat of her marital rights instead of the deliberate act of a court of justice on due process, i. e., on notice and a full hearing, whose judgment imports verity and against which nothing can avail while it stands.

It must be held, then, that when the divorce went against her, by that token her right to support as a wife during the marriage as well as all right to dower or any other provision in the event she became his widow ceased. As to Robert H. Donaldson, by that event, she became as a stranger, no more, no less. True he and she could become reconciled and remarry. That is as you like it. But when they did so it was precisely the same in the eye of the law as if they had never been married to each other before. It will not do in some mystic way to link the second marriage with the first so as to carry over her rights under the first to the second. The dead coal of her lost marital rights could not be set ablaze by any new flame of love, as a matter of law. As to her, old things had passed away and all things had become new. We know of no principle of law permitting that to be done, and industrious counsel have cited us to no case deciding it may be done.

(c)   It follows from the ruling in paragraphs *a* and *b* as an irresistible conclusion, I think, that if plaintiff lost her marriage rights by the divorce, she also lost her incidental right to complain of fraud practiced upon her in the first marriage contract or of fraud practiced upon her in the deed executed during her first marriage, none of which frauds, if any, injured her except as they touched those same martial rights. Her right to complain of those frauds was but an incident to the then existing marriage relation and when that principal thing was destroyed by the divorce, on her adjudged fault, the incidents went with the principal. The maxim is: The incidents of a thing follow tacitly. The rule is fraud must conjoin with injury to be actionable.

<span style="float:left">Marital Rights: Incidents.</span>

. If there was any evidence tending to show that the deed made during the existence of the first marriage was made in view of not only a contemplated divorce but in contemplation of a reconciliation and remarriage (an unthinkable hypothesis, and one wholly unsupported by an iota of proof) the case might be brought within the purview of those principles of law which avoid conveyances made by the husband in contemplation of marriage in fraud of the marital rights of the wife. For the doctrine of the law is that a wife can complain of such frauds (done in contemplation of marriage or during its existence) and stands on the foot of a creditor in that regard. [Davis v. Davis, 5 Mo. 183; Stone v. Stone, 18 Mo. 389; Hach v. Rollins, 158 Mo. 182; Newton v. Newton, 162 Mo. 173; Rice v. Waddill, 168 Mo. 99.]

The noble maxims of the law are: Dower is favored as the reward of chastity; in doubt the response is in favor of dower; the law favoreth life, liberty, dower. Accordingly courts are astute and vigilant in preserving dower. [Chrisman v. Linderman, 202 Mo. l. c. 614, et seq.;

<span style="float:left">Divorce: Dower.</span>

Blevins v. Smith, 104 Mo. l. c. 588, et seq.] Agreeable thereto all the cases run. But in this case we are asked to do the impossible thing of ignoring a divorce suit which destroyed her dower, and carrying over her rights under the first marriage to her second marriage when there is an impassable gulf fixed between the two. Such a ruling would not only breed confusion and chaos in the law, spoil its symmetry, draw within the hazard of its novel doctrine other cases, but we think it could not be sustained on principle. If the deed was delivered so as to be operative as a conveyance as between the parties to it, then on the remarriage it must be held that plaintiff married a man who at that time held a life estate only in the land and was not "seized of an estate of inheritance, at any time during the marriage"—an essential element in the endowment of a widow. [R. S. 1909, sec. 345.]

III. *Of the delivery of the deed in question.*

The life of a deed is its delivery. Without delivery a deed is a mere dead scroll and has no life in it operative to vest an estate. Delivery hinges on intent and is usually a mixed question of law and fact. [Chambers v. Chambers, 227 Mo. l. c. 282.]

Assuming for the purposes of the point, as has been just held, that the divorce decree cut off the right of plaintiff to complain of frauds upon her marital rights existing during and by virtue of her first marriage, then the question remains: Was the deed actually delivered for the purposes of a conveyance?

It would be an ostentatious display of industry to set forth in detail the record facts and evidence showing delivery. We proceed to judgment with these observations: If any credence can be put in human testimony there was a delivery of that deed. There can be no two ways about that. The transaction was not hid in a corner. The facts are not equivocal, springing doubt. There were many eyes to see what

was done and ears to hear what was said and some of them admittedly friendly to plaintiff. Mark, the known infirmity of the first deed was the very fact of non-delivery. Is it supposable the second (made to take the place of the first) was also not delivered when there was nothing nigh to hinder? Attorneys learned in the law (and *rectus in curia*) presided over its delivery.

We pause to notice that counsel for appellant assume to refer to one of Mr. Donaldson's counsel as "a prestidigitator," etc. In taking that course counsel overlook the red danger signal in the *dictum* of GARY, J., in that behalf, viz.: Ill nature and vituperation in a brief excite suspicion that its maker is on the wrong side of the case. [Touhy v. Daly, 27 Ill. App. l. c. 460.] That *dictum* is not without standing ground in reason; for is not the cynical advice of General T. to an inquiring young brother often followed (more's the pity), viz.: "When the law and the facts are both against you, there are only two courses left open—yell like an Indian, or abuse the attorney on the other side." But enough of that. (*Verbum sat sapientii*.)

Recurring to the occasion the deed was executed, it was a time fixed for a family settlement and that was what they met for. Disinterested witnesses present testified to a delivery in unequivocal terms, giving circumstances. Plaintiff alone stands out *contra*. It would be a daring and anxious matter to rule that because we might think it should not have been delivered it was not, and yet to that complexion we must come at last if we held there was no delivery. Indeed, as we read the briefs of counsel for appellant, the delivery of that deed is practically conceded. Whether conceded or not it must be held to have been accomplished.

The views announced make it unnecessary to consider a letter written by Robert H. Donaldson to plain-

tiff on the eve of their second engagement, of which much is made in appellant's brief. Two views might be taken of that letter anent its use of the word "home" in connection with the number of acres in the farm, but in the worst view to the writer of the letter, if the deed was delivered as we have held, he had lost the power to affect the title by his assurances, where, as here, the grantees in the deed are not shown to have taken part in practicing any fraud upon her in that regard or to have subjected themselves to an estoppel. Indeed the use made of that letter seems to have been an afterthought. It was not introduced in chief when plaintiff was making her case and estoppel is not pleaded. The case cannot turn on that letter.

We have conceded to appellant the well settled proposition of law that the relation of a man to a woman he is about to marry is a confidential one in an exacting and stringent sense. In fact, none is more so. He carries the burden of showing that any *ante nuptial* contract entered into under the glow and trust of that tender and trust relation was made fairly and understandingly on full disclosures, and is just and adequate. Courts are fond of applying that doctrine when the case calls for it. In this case it is applied to the annulment of the second contract. As to the first contract, we are of opinion the divorce stands in the way of giving plaintiff any relief from that doctrine or any other.

*Antenuptial Contract: Confidential Relation.*

The rulings set forth dispose of the case. Questions by appellant relating to the introduction of testimony need not be discussed because if the challenged testimony was rejected it would avail her nothing. So, the rule in equity is that questions relating to the admissibility of testimony, when that testimony is here on a hearing *de novo* on appeal, can rarely work a reversal. We can reject, consider, weigh and decide on the competent proof. The chancellor set aside the

second marriage contract and opened up the personalty to plaintiff's rights. That decree measures out her rights as the widow of Robert H. Donaldson on this record. If we could enlarge those rights by permitting her to share in the real estate, it would be a matter of judicial satisfaction, but for reasons stated that cannot be done.

Let the decree be affirmed. It is so ordered. All concur but *Brown, J.*, who dissents.