In re Estate of John E. HOSMER, Deceased, Madalyne Hosmer, Appellant,

v.

Thomas Robert HOSMER, Douglas Andrew Hosmer, Sarah Abagail Hosmer, Julia Nancy Hosmer, John David Hosmer, Jane Hosmer, Kent Hosmer, Mary Hosmer, Ann Hosmer, Stephen Hosmer, Craig Hosmer, Ellen Hosmer and Joe Hosmer, Respondents.

No. 11607.

Missouri Court of Appeals, Southern District, Division One.

Dec. 19, 1980.

Rehearing Denied Jan. 12, 1981.

Scott R. Traylor, Raymond A. Morwood, Springfield, for appellant.

John W. Sims, Haymes, Sims & Thompson, Marshfield, John B. Newberry, Springfield, for respondents.

1. All references to statutes are to RSMo 1969, V.A.M.S.

2. "474.120. Inheritance and statutory rights deemed waived, when.—The rights of inheritance or any other statutory rights of a surviving spouse of a decedent who dies intestate shall be deemed to have been waived if prior to, or after, the marriage such intended spouse or spouse by a written contract did agree to waive such rights, after full disclosure of the nature and extent thereof, including the nature and extent of all property interests of the parties, and if the thing or promise given to the waiving party is a fair consideration under all the circumstances."

3. "MARITAL AGREEMENT

FLANIGAN, Judge.

John E. Hosmer, an attorney, died intestate on June 11, 1978. At the time of his death he owned real estate valued at $105,-500 and personal property valued at $18,-443.04. After an administratrix had been appointed by the probate division of the Circuit Court of Greene County, his widow, Madalyne Hosmer, filed application for exempt property (§ 474.250),[1] family allowance (§ 474.260), and homestead allowance (§ 474.290).

The decedent had previously been married to Melba Hosmer. That marriage lasted 29 years and ended by divorce in August 1976. Children of that marriage filed a motion opposing the widow's application. The motion alleged that on December 3, 1977, two days prior to their marriage, Hosmer and Madalyne executed an antenuptial contract which was "supported by valuable consideration given by the decedent to the said Madalyne, [was] signed by said Madalyne, after a full disclosure of the nature and extent of the right which she was giving up, and is a fair consideration under all of the circumstances, and in all respects complies with § 474.120."[2] The antenuptial contract, denominated "Marital Agreement," is set out below.[3]

After an evidentiary hearing the court entered its order finding that the antenuptial agreement was valid and barred the widow's right "to make any recovery from

"This Ante-Nuptial Contract made between Madalyne Louise Marler and John Edmund Hosmer this 3rd day of December 1977.

"Whereas the parties are going to intermarry, now therefore it is agreed as follows:

"Madalyne Louise Marler will claim nothing in the property or estate of John Edmund Hosmer, neither as support, child maintenance or otherwise, even marital rights, but in return therefore her children born and unborn will have a name.

"Both parties, regardless of any public policy will never seek a Dissolution of Marriage.

"John Edmund Hosmer is drawing up a Trust Agreement which will provide for the education in college, if they so wish to go for such children.

/s/ John E. Hosmer
/s/ Madalyne Louise Marler"

his estate by virtue of inheritance or the marriage relation." The order denied the three-fold application. The widow appeals.

The widow asserts that the antenuptial agreement was invalid, and the trial court erred in holding otherwise, for several reasons: The agreement did not meet the requirements of § 474.120; the agreement lacked consideration; the decedent did not make a full and fair disclosure to his intended spouse of the nature and extent of his property and of the rights of inheritance and other statutory rights of a surviving spouse; the agreement was signed while she was under duress and while a confidential relationship existed between her and the decedent; she did not understand the legal effect of the agreement when it was executed; and the agreement is contrary to public policy by reason of its provision purporting to prohibit divorce. For the reasons which follow, this court holds that the antenuptial agreement was invalid and that the trial court erred in ruling otherwise.

As its language reflects, § 474.120 applies to both antenuptial and postnuptial agreements but is limited to situations of intestacy. Its counterpart with respect to testate decedents is § 474.220, which also embraces antenuptial and postnuptial agreements. Since 1963 the statutes have been couched in similar, but not identical, language with respect to requirements for the validity of such agreements. With respect to the two statutes, an eminent authority on Missouri probate law has said: "Decisions under either section should be helpful in construing the other. Both sections appear to embody the principles that were being developed by the decisions." Maus, Missouri Practice, Probate Law and Practice, Vol. 4, § 1241.

For a waiver of the rights of inheritance or any other statutory rights of a surviving spouse of an intestate decedent, compliance with § 474.120 requires: (a) a written contract to waive such rights; (b) prior full disclosure of the nature and extent of the rights, including the nature and extent of all property interests of the parties; (c) the giving to the waiving party of a thing or promise which is a fair consideration under all the circumstances.

Some of the principles which are germane to the disposition of this appeal are expressed in *Estate of Youngblood v. Youngblood*, 457 S.W.2d 750 (Mo.banc 1970). They are stated in the next paragraph.

The rules governing the validity of an antenuptial agreement, of the type under consideration, are unique and are distinct from the requirements for the execution of an ordinary contract. The statutory requirement that there be a fair consideration under all the circumstances "not only requires that there be such consideration as would support a simple contract, but further that the consideration moving to the spouse or prospective spouse surrendering marital rights be fair and equitable in the particular circumstances." The fairness of the agreement must be determined as of the date of the agreement. So long as the surviving spouse had full knowledge, actual or constructive, of the other's property and the survivor's rights therein, the agreement is not invalid merely because the provision for the waiving survivor is less than the survivor would have received in the absence of the agreement. Although reciting the property holdings, or listing them separately, may be advisable from the drafting standpoint, the absence thereof is not necessarily fatal to the agreement. Determination of the sufficiency of the disclosure or equivalent knowledge is usually dependent upon the circumstances of the case. The ultimate inquiry is whether the surviving spouse against whom enforcement of the agreement is sought has been defrauded or overreached.

When the validity of a waiver agreement is to be tested by whether it meets the requirements of § 474.120, an issue arises with respect to the burden of proof. Does the spouse, who allegedly waived, have the burden of proving the invalidity of the agreement or do those who rely upon the agreement have the burden of proving its validity? Of course the contents of the instrument itself may facilitate or hamper the carrying out of that burden, wherever it may lie. The Missouri cases are not wholly in accord on the question.

In *Donaldson v. Donaldson,* 249 Mo. 228, 155 S.W. 791, 797 (Mo.1913), it is said, "[T]he relation of a man to a woman he is about to marry is a confidential one in an exacting and stringent sense. In fact, none is more so. He carries the burden of showing that any antenuptial contract entered into under the glow and trust of that tender and trust relation was made fairly and understandingly on full disclosures, and is just and adequate." In *Jones v. McGonigle,* 327 Mo. 457, 37 S.W.2d 892, 894 (1931) the court said, "Ordinarily, inadequacy raises a presumption of fraud and concealment, throwing the burden of proving the absence of fraud and concealment upon the husband or those claiming under him . . ."

On the other hand, in *McQuate v. White,* 389 S.W.2d 206 (Mo.1965), where a widow sought a declaratory judgment decreeing the invalidity of an agreement, apparently postnuptial, the court said, at p. 212, "The burden of making a showing that the agreement is unfair is naturally on the party seeking to invalidate it." That language was quoted by this court in *Matter of Estate of Soper,* 598 S.W.2d 528, 537 (Mo.App. 1980).[4]

■ Where, as here, the existence of an antenuptial agreement is pleaded as a defense to rights which a widow otherwise would have, and the persons relying upon the agreement claim that it complies with § 474.120, it seems reasonable that the burden of proving the validity of the agreement should be upon them. Mere introduction of a written agreement, although duly signed, would not alone satisfy that burden. The other factors of full disclosure and fair consideration, at least unless prima facie evident on the face of the instrument, must also be shown; otherwise the agreement falls short of satisfying the statute.

Whatever the rule may be with regard to the burden of proof, the instant record does not require resolution of the problem for the reason that if the burden lay upon the movants to establish validity, they failed to do so, and if the burden lay upon the widow to establish invalidity, the manner in which the instant record was made achieves that result.

■ Exercising the privilege granted them under § 491.030 to cross-examine the widow as an adverse witness, the movants, through their counsel, placed her on the stand. In so doing movants bound themselves by her direct testimony to the extent that it was uncontradicted or was the only evidence on the point. *Taylor v. Riddle,* 384 S.W.2d 569, 574[3] (Mo.1964); *Richeson v. Roebber,* 349 Mo. 132, 159 S.W.2d 658, 659[2] (1941); *Stringer v. Reed,* 544 S.W.2d 69, 74[8] (Mo.App.1976); *Frazier v. Stone,* 515 S.W.2d 766, 769[13] (Mo.App.1974). Movants were not bound by the testimony of the widow elicited on cross-examination by her own counsel. *Frazier,* supra, at 770.

On direct examination the widow testified that she and decedent commenced living together in the latter part of July 1976, and in February 1977 she became his legal secretary. She and decedent were married on December 5, 1977. At one time they lived in an apartment above the Daily Events building and they also lived together in the Midtown Law Office. According to the brief of movants as respondents here, the two buildings referred to were "the chief asset of the estate and composed 99 percent of the estate." The widow conced-

---

4. Foreign authorities also conflict on the issue of where the burden of proof lies. The following cases place the burden on the attacking spouse to prove the invalidity of the agreement. *Linker v. Linker,* 28 Colo.App. 131, 470 P.2d 921 (1970); *Del Vecchio v. Del Vecchio,* 143 So.2d 17 (Fla.1962); *Christians v. Christians,* 241 Iowa 1017, 44 N.W.2d 431 (1950); *In re Estate of Strickland,* 181 Neb. 478, 149 N.W.2d 344 (1967).

The following cases place the burden upon those relying upon the agreement to prove its validity. *In re Estate of Harbers,* 104 Ariz. 79, 449 P.2d 7 (1969); *Davis v. Davis,* 196 Ark. 57, 116 S.W.2d 607 (1938); *Seuss v. Schukat,* 358 Ill. 27, 192 N.E. 668 (1934); *Re Neis' Estate,* 170 Kan. 254, 225 P.2d 110 (1950); *Truitt v. Truitt,* 290 Ky. 632, 162 S.W.2d 31 (1942); *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (Md. 1967); *Kosik v. George,* 253 Or. 15, 452 P.2d 560 (1969); *In re Estate of Vallish,* 434 Pa. 88, 244 A.2d 745 (1968); *Friedlander v. Friedlander,* 80 Wash.2d 293, 494 P.2d 208 (1972). See 41 Am.Jur.2d Husband and Wife, § 314, p. 255.

ed that the agreement was signed by the decedent and by her a day or two prior to the marriage.

■ Movants' counsel posed this question to the widow, "Were you familiar with the property that he owned?" Her answer was, "No. I was not." When counsel asked the widow whether she knew that decedent owned the Midtown Law Office her reply was, "No, I did not know that he owned it. I knew that he owed a lot of money on it." When asked whether she knew that decedent owned the Daily Events building the widow's reply was, "No. I did not know any of that for a fact." When asked whether she was familiar with a "restaurant property which Hosmer owned with Mr. Lawson in Marshfield," the widow's response was, "Not really."

David Lawson, a Marshfield attorney, was the only other witness produced by movants concerning the circumstances surrounding the execution of the antenuptial agreement and the nature and extent of the property of the parties. Mr. Lawson testified that he and decedent owned a cafe building in Marshfield. Lawson also testified that "shortly before Mr. Hosmer's death" he and Hosmer discussed the Marshfield property and Madalyne Hosmer was present "some of the time." After the commencement of administration the administratrix, with approval of the probate court, sold decedent's ½ interest in the Marshfield cafe building to Mr. Lawson for $1,000.

Mr. Lawson conceded that he did not know any of the circumstances surrounding the signing of the antenuptial agreement nor did he know of any consideration given for it.

On cross-examination by her own counsel the widow testified that at the time she signed the antenuptial agreement she "did not know anything about the buildings, did not know anything about what Hosmer owned or had, and did not know anything of Hosmer's business matters." She also stated she did not receive anything for signing the agreement. With respect to being Hosmer's legal secretary, she testified that she would just answer the telephone and do some typing, and that she was not a good typist. She testified that she was a nurse by profession.

The foregoing evidence falls short of showing a prior full disclosure to the prospective spouse of the nature and extent of the rights waived, including the nature and extent of all property interests of Hosmer.

On the issue of whether a "fair consideration under all the circumstances" was given to the waiving party, it is necessary to consider the provisions of the agreement dealing with names, the forebearance to seek a dissolution, and the trust agreement.

The agreement recites that "in return" for appellant's waiver "her children born and unborn will have a name." The application for letters of administration lists, as survivors of the decedent, 13 children born of his marriage to Melba Hosmer and also lists "Louisa Mae Hosmer, a minor, age nine months." The surviving spouse is also listed.

The statement of facts portion of the brief of *movants* says that the heirs of Hosmer, in addition to movants, are Madalyne Hosmer (appellant), "and a minor child, Louisa Mae Hosmer, born to appellant prior to her marriage to the deceased." The probate file reflects that Louisa Mae Hosmer was approximately one month old when the marital agreement was signed.

"[A] person's name is the designation given to the individual by himself or herself and others and . . . an individual may change his or her name." *In the Matter of Natale*, 527 S.W.2d 402, 404 (Mo.App.1975). In that case the court pointed out that § 527.270, dealing with the procedure for change of name, does not abrogate and merely supplements the common law method of change of name.

■ Under the common law a person is free to adopt any name if it is not done for a fraudulent purpose or in infringement upon the rights of others. *In re Strikwerda*, 216 Va. 470, 220 S.E.2d 245, 246 (1975). In *Manor Homes, Inc. v. Sava*, 73 Misc.2d 660, 342 N.Y.S.2d 291 (1973) the court

pointed out that under the common law one may use any name in the absence of fraud and the right to do so continues despite the enactment of a statutory procedure for a change of name.

"The common law, in the absence of fraud or other like evasion of obligations, permits the free use of any name a person may choose. The proudest patronymic in the land is available to the lowliest individual, and this without anyone's permission." *Application of Green*, 54 Misc.2d 606, 283 N.Y.S.2d 242, 244 (1967). "A person may adopt what name he pleases." *Ingram v. Watson*, 211 Ala. 410, 100 So. 557, 559 (1924). "In the absence of a statute to the contrary, a person may ordinarily change his name at will, without any legal proceedings, merely by adopting another name." 57 Am.Jur.2d Name § 10, p. 282.

■ Neither side has cited any authority holding that the taking of the name of Hosmer by Louisa Mae Hosmer required the consent of the decedent. This court holds that the provision pertaining to the "having" of a name, does not constitute, alone or in company with the other provisions of the antenuptial agreement, "a fair consideration under all the circumstances."

The antenuptial agreement recites: "Both parties, regardless of any public policy will never seek a dissolution of marriage." The widow contends that the quoted language violates public policy. The movants do not take issue with that contention and indeed state that the widow "is in pari delicto with the decedent" with respect to that provision. Movants, at least tacitly conceding that the provision is invalid, content themselves with arguing that it is "separable" from the other portions of the agreement and does not invalidate the latter.

Neither side has favored this court with any authority on the question of whether or not mutual promises by *prospective* spouses not to seek a divorce are valid and enforceable or are void, nor has this court found such authority. With respect to people who are already married, there are divergent views as to the validity and enforceability

of agreements made to prevent a divorce. 24 Am.Jur.2d Div. and Sep., § 14, p. 189. There are authorities holding that when one spouse has grounds, already matured, to divorce the other, forebearance by the former to bring or prosecute a meritorious action is a valid consideration for a promise. *Upton v. Ames and Webb*, 179 Va. 219, 18 S.E.2d 290, 293[3] (1942); *Polson v. Stewart*, 167 Mass. 211, 45 N.E. 737 (1897); *Duffy v. White*, 115 Mich. 264, 73 N.W. 363 (1897).

■ There is in every marriage at least an implied agreement not to seek a divorce and in the usual marriage ceremony the parties exchange pledges to remain man and wife "until death do us part." The fact is, however, that divorce terminates marriages almost as frequently as death. It is unnecessary to express an opinion upon the legality of the mutual promises to refrain from seeking dissolution. It is sufficient to state that this court finds that such a mutual undertaking, standing alone or in company with the other provisions of the antenuptial agreement here, does not constitute "a fair consideration under all the circumstances."

■ Movants claim that "fair consideration" for the agreement lies in its final paragraph, which recites that Hosmer "is drawing up a trust agreement which will provide for the education in college, if they so wish to go for such children." It is unnecessary to consider whether that provision suffers from its vagueness, its executory aspect, or the fact that the direct beneficiaries would be someone other than the waiving spouse. A sufficient answer is that there is no evidence to show that such an agreement was ever prepared nor was any such trust funded and the reasonable inferences are otherwise.

In *McQuate v. White*, 389 S.W.2d 206 (Mo.1965) the court dealt with the validity of a postnuptial agreement entered into in 1954. The husband died in 1961 and the court held that the inventory filed in his estate was admissible into evidence as having some relevancy "in the attempt to arrive at an estimate of the value of de-

ceased's property" at the time of the agreement. In the case at bar the agreement was entered into only seven months prior to Mr. Hosmer's death. The record reflects that during those months his health was not good, that another lawyer was taking care of his legal practice, and that he was hospitalized.

There was no testamentary trust because Hosmer died intestate. For several reasons the clear inference is that there was no inter vivos trust. All of the real estate which, so far as the record reflects, Hosmer owned at the time of the signing of the agreement was still owned by him at the time of his death. There is no showing that an inter vivos trust was funded by any personal property nor that any personal property owned by decedent at the time of the agreement was unaccounted for by the inventory or by necessary living expenses incurred during his final months. It is inferable from a comparison of the record concerning Hosmer's holdings at the time of the agreement with the file of the probate court [5] that the decedent did not create a trust [6] of the type mentioned in such general terms in the last paragraph of the antenuptial agreement.

Also significant on the issue of "fair consideration" is the fact that the agreement is "one way" in the sense that it purports to waive the rights of the woman in the man's estate but contains no waiver of his interest in her property, if such she had.[7]

The agreement contains no recital that, prior to its execution, there was full disclosure of the nature and extent of the rights purportedly waived by the widow nor does it contain any recital or listing concerning the nature and extent of the property interests of the parties. The evidence at the trial, binding on the movants, was to the general effect that no such full disclosure was accorded decedent's prospective spouse, prior to or at the signing of the agreement. There was no giving to the prospective spouse of a thing or promise which was a fair consideration under all the circumstances.

The trial court erred in ruling that the antenuptial agreement was a valid one. The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

TITUS and GREENE, JJ., concur.

---

5. Pursuant to Rule 81.12 V.A.M.R. this court directed the clerk of the probate division to send up the probate file, of which the trial court could take judicial notice.

6. The widow's brief in this court states, flatly, that Hosmer's promise to create a trust "was not carried out." That statement is neither challenged nor denied by movants.

7. Of course if the wife had little or no property, that would diminish or eliminate the value of the husband's waiver, even if he had made one, at least in the absence of reasonable prospects for her obtaining property.