Fred A. BOYER, Plaintiff-Appellant,

v.

George CALLAHAN and Kenneth Downs,
Defendants-Respondents.

No. 32151.

St. Louis Court of Appeals.

Missouri.

July 19, 1966.

Motion for Rehearing or for Transfer to
Supreme Court Denied Sept. 13, 1966.

John J. Relles, John J. Stewart, Clayton, for plaintiff-appellant.

Carter, Bull, Baer, Presberg, Lee & Stanard, Richard O. Funsch, St. Louis, for defendant-respondent George Callahan.

Dennis J. Quillin, Clayton, for defendant-respondent Kenneth Downs.

LACKLAND H. BLOOM, Special Judge.

Plaintiff-appellant instituted suit in the City of St. Louis against the defendants alleging that they "owned, kept and harbored a collie dog of dangerous and vicious propensities," and that they negligently allowed and permitted said dog to bite the plaintiff. The parties will hereafter be referred to in accordance with their designations in the trial court. The jury returned a verdict in favor of plaintiff and against defendant Callahan in the sum of $9,000 and in favor of the defendant Downs. The trial court sustained a motion of defendant Callahan for judgment in accordance with his motion for a directed verdict and in the alternative sustained defendant Callahan's motion for a new trial. The court further sustained the plaintiff's motion for a new trial as to the defendant Downs. This appeal is from the order of the trial court sustaining defendant Callahan's motion for judgment and in the alternative his motion for a new trial. No appeal has been taken by defendant Downs from the order granting plaintiff, a new trial as to him.

We will set forth only those facts essential to a consideration of the issues raised on this appeal. The defendant Downs and his wife owned a farm in Hematite, Missouri, where they raised chickens for the purpose of producing eggs for sale. On July 3, 1962, pursuant to prior permission granted to him, the plaintiff Boyer and his family came to a portion of the Downs farm for the purpose of camping out over the 4th of July holiday. Boyer and his two boys had remained on the farm, sleeping in Boyer's truck, on the evening of July 3rd. The next morning plaintiff experiencing a call of nature went behind his truck for the purpose of relieving himself. While so engaged and standing behind the truck, he was attacked and bitten by a collie dog on a private and very sensitive part of his anatomy. It is not necessary for purposes of this review to set forth the nature or the extent of the alleged injuries sustained by plaintiff by reason of the dog's bite.

The evidence is in conflict as to who owned the dog on the date of the attack on plaintiff. Plaintiff had not seen the dog prior to the attack at any time. Peggy Downs, wife of the defendant Kenneth Downs, testified for the plaintiff that the defendant Callahan had brought the dog out to their farm and had asked her husband if he could leave it there for " * * * a few days to see how it would get along * * *." She testified that Callahan had said that he couldn't keep it in the city any longer "Because it had gone over after some lady * * *" and they had to get rid of the dog. They brought it out to their farm to see how it would work out there and to see what they could do with it. She testified that she was present when the dog was brought out and the dog acted all right. But when it was taken to the garage it would curl its lip up and snarl and she did not go near it because she was afraid of it. Mr. Callahan brought some dog food and two red dog bowls with the dog. She saw the dog lunge at one of the men who worked on the farm and it bit him on the arm but didn't hurt him very much. She thought it was the next day after the dog had been left there and was positive that it was before the plaintiff was bitten. She said after the plaintiff was bitten that they never saw the dog as it ran away. She testified that she was afraid of the dog and told her husband to give it back to George. On cross-examination she stated that Mr. Callahan had said the police had been called because the dog was frightening some people or some ladies.

Defendant Callahan testifying on his behalf stated that he had acquired the dog in

July, 1959, as a pet for his five children when the dog was six weeks old. He kept the dog in his back yard until it got large enough that it would jump the fence and he then had a special fence built for the dog which was six feet high and enclosed an area about four feet wide and twelve to fourteen feet long. He testified that he never knew the dog to harm any of the children or show any animosity toward any other people or to act in a threatening manner toward any person. He had received a complaint that the dog annoyed a party in the neighborhood with his barking. On cross-examination he stated that the police came to see him about the dog on one occasion in March or April of 1962 and merely advised him that a neighbor had complained about the dog barking and disturbing her stepfather. They asked him to try to keep the dog quiet.

He had known defendant Downs for approximately fifteen years. He knew that Downs owned other dogs and asked him, "Would you like to have another dog?" He said he thought this conversation took place in his, Callahan's, office in the city and that at that time Downs said that he thought he would like to have another dog. Within a few days prior to the time he took the dog out there he again talked to Mr. Downs and he said, "Yes, bring the dog out." He thought he took the dog out to the farm on Saturday, June 30th, although it could have been on the following Sunday. He and two of his children took the dog to the Downs' farm and Mr. Downs and his wife were there. The dog was on a leash when he took him out of the car and they went over to a picnic bench and sat down and gave the dog a chance to look around. They took the leash off of the dog and sat and talked for a few minutes. They looked around the farm and the egg factory and at that time the dog was put in a fenced-in enclosure. The dog jumped the fence and came back to them. They put him in a second time and he again jumped the fence. The dog was not acting in a vicious manner but in a friendly manner and came over to the kids.

When they got ready to leave they put the dog in a wooden shed, like a garage, and closed the door and he and the children got in the car and drove off. He brought the dog's collar, leash, two dog bowls, about a half sack of Purina Dog Chow, and six or eight cans of dog food. He brought everything except the dog house which wouldn't fit in his station wagon. It was his intention to permanently give up ownership of the dog at that time. When he took the dog to Downs the dog was approximately three years old and quite a large dog. On cross-examination he denied ever hearing the dog snarl and did not hear it growl except in a playful way when the kids would wrestle with it. Nor did he ever have occasion to see it threaten any person. The reason he wanted to get rid of the dog was because his yard was too small for the dog or the dog was too large for the yard and because of the fact that a neighbor was complaining about the dog barking. He wanted to keep peace with the neighbors. He did not charge Mr. Downs anything for the dog as he was giving it to him. He did tell Downs that if for some reason, at a later date, Downs decided he didn't want the dog, to let him know and he would come and get him and try and find someone else who would take the dog. He denied ever having received a message from Downs prior to the occurrence on July 4th to come and get the dog and stated that after he was advised that the dog had bitten someone and had run away that he and his children went down to try and find the dog but could not do so. He stated that he intended the transfer to be final but that he wanted Downs to know that if at some future time he did not want the dog, rather than just turn him loose, he would want Downs to call him and he would take the dog back and try to find another home for it.

Defendant Downs testifying in his own behalf stated that approximately a week before defendant Callahan had brought the dog to his farm he had a conversation with him in Callahan's office. Callahan asked him whether he would be interested

in a dog and he explained to Callahan that he had an interest in dogs and that he had quite a few and didn't want another dog. He had a hobby of raising dachshunds and had five females, and a male dog would present a problem. He stated Callahan then asked him if he would care for the dog for a short time. He got the impression from Callahan that the dog was causing quite a bit of trouble at home and he had to move the dog almost immediately. "I said I would help him." He stated he was at the office again the Friday before Callahan brought the dog to the farm and that Callahan asked him if it would be all right to bring the dog that weekend. According to Downs nothing was said concerning the extent of the time that he was to keep the dog. He added, "I would assume from what they said they had to remove the animal almost immediately, did not want to destroy it. They felt attached to it because it was a children's pet * * *." He testified that when Callahan first arrived with the dog it got in a fight with one of his dachshunds and he had to lock up the dachshund. While Callahan was there they put the dog in an enclosure and it jumped through the window and over a six foot high fence on two occasions. After Callahan had left he locked the dog in a utility shed but that the dog was able to escape by digging a hole through the floor. He kept enticing the dog into the shed with food but he would continue to escape and by Tuesday they abandoned any effort to confine him. His wife kept after him to call George from Sunday on and he did on several occasions. He did not reach him but left messages at his home and office. He notified defendant Callahan on the date of the accident. He told him his dog was loose and that he couldn't get him and for him to bring his son Richard and let Richard get him. It was his intention when he took the dog not to keep him permanently but only for a short time while Mr. Callahan found a home for him "A few days, a week, at the most."

On cross-examination Downs stated that the attack on the hired hand, Johnson, which his wife had described, occurred after the plaintiff was bitten. It was on the same morning when they were trying to get hold of the dog. He did not think that the dog punctured Johnson's skin but merely scratched him. He stated that he thought Callahan had said the dog had attacked a woman and had scared the gas man. "* * He said bothering the gas man, for one thing, and attacked a woman down the street. By attack, I didn't think he bit her. He just jumped on her and scared her, and he made the same type of motions toward me. I didn't consider it an attack, not a complete act of biting. I didn't think he bit anyone yet. I did know the police had come concerning this woman about the attack the dog made on her." He did not remember Callahan saying anything about barking. Mr. Callahan never told him the dog had bitten anyone.

The trial court in sustaining the post-trial motion of defendant Callahan for judgment in accordance with his motion for a directed verdict did so for the reason that "* * * Callahan was not shown to be in possession, custody, charge or control of the animal at the time of the mischief; therefore, no case has been made as to him."

■ Plaintiff asserts that the trial court erred in sustaining the motion for a directed verdict for the reason that (a) Missouri imposes an absolute liability on the owner of a vicious animal upon the theory of nuisance rather than negligence, and (b) liability attaches to the owner-bailor of such a vicious animal while in the possession of a bailee, and (c) such liability cannot be eliminated by a conveyance or tranfer to a third person. Respondent on the other hand contends that the trial court properly sustained the motion for a directed verdict for the reason that the evidence failed to establish a claim which would entitle plaintiff to relief. The question to be resolved is whether or not plaintiff made a submissible case for the jury as against defendant Callahan, and such determination must depend on a review of the evidence in a light most fa-

vorable to plaintiff. Mitchell v. Newsom, Mo.App., 360 S.W.2d 247, 248.

◼ We start with the well recognized proposition that in a dog bite case, such as this, the gist of the action is the keeping of a vicious dog after knowledge of his vicious propensities. Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667, 13 A.L.R. 485; State ex rel. Kroger Co. v. Craig, Mo.App., 329 S.W.2d 804, 809; Maxwell v. Fraze, Mo.App., 344 S.W.2d 262, 264; Mitchell v. Newsom, supra, 360 S.W.2d l. c. 249.

◼ Plaintiff, to sustain his burden, must point out the evidence establishing the vicious propensities of the dog that bit plaintiff and that defendants knew or should have known of them prior to the occurrence involved in this action. There is in the record direct evidence of only one occasion in which the dog prior to July 4th undertook to bite or to harm any person. The defendant Downs' wife testified that the dog attacked one of the hired hands the day after Callahan had left it and prior to the time the dog bit plaintiff. Defendant Downs testified that this occurred on the same day after the dog bit plaintiff. In any event, Callahan was not shown to have been present on that occasion and there is no evidence that he was aware of this occurrence. Plaintiff, of course, knew nothing about the dog either before or after being bitten by it. There is nothing in defendant Callahan's testimony which would be favorable to plaintiff in regard to the vicious character of the dog prior to his delivering the dog to Downs. He did testify to the fact that a complaint had been made by a neighbor through the police of the dog's barking. He denies any other knowledge of any vicious action of the dog except to state that he did hear it "growl" when playing with the children. He denies the conversations testified to by Mrs. Downs and her husband with respect to his reasons for wishing to find another home for the dog.

The only other testimony which would impose "scienter" on defendant Callahan with respect to a vicious disposition of the dog was that offered by defendant Downs and his wife regarding conversations with Callahan at the time or prior to the delivery of the dog. Mrs. Downs testified that she was present when the dog was delivered and that she heard Callahan ask her husband if he could leave it out there for a few days to see how it would get along. " * * * he said he couldn't keep it in the City any longer because it had * * * gone over after some lady—I don't know how many people, but they called the police on him and they had to get rid of the dog, and so they brought it out to our place to see how it would work out there, to see what they could do with it." On cross-examination she stated, " * * * George just said that the police had been called because the dog was frightening some people or some ladies. I can't remember, I think it was some old lady." Defendant Downs testified with respect to such conversation as follows:

"Q Did he say what kind of trouble the dog. was causing? * * *

"A I thought he said that the dog had attacked a woman and had scared the gas man."

◼ Later on Downs testified, " * * * He said bothering the gas man, for one thing, and attacked a woman down the street. By attack, I didn't think he bit her. He just jumped on her and scared her, and he made the same type of motions toward me. I didn't consider it an attack, not a complete act of biting. I didn't think he bit anyone yet. I did know the police had come concerning this woman about the attack the dog made on her." If this evidence constitutes sufficient evidence of the viciousness of the dog, the jury would be entitled to believe Mr. and Mrs. Downs and to disbelieve Callahan's version of the conversations. We think, however, that the most that the testimony could establish, either directly or by inference, would be that defendant Callahan was aware of the propensity of the dog to jump at or scare people and that there was no evidence of any propensity of the dog to bite or otherwise harm

people. It is true that it was a large dog capable of jumping fences as high as six feet and could easily be expected to frighten and annoy old ladies. These would be propensities which would warrant an owner in seeking another home for the dog outside of a populous city but certainly not of such a nature, standing alone, as to require him to destroy the dog.

There is no evidence in this case that defendant Callahan had any knowledge of a propensity of this dog to bite. It has been held that the injury complained of must result from the exercise of the dangerous propensity. By this it is not meant that a dog must have bitten someone before in order to demonstrate a vicious propensity for biting. In Maxwell v. Fraze, supra, 344 S.W.2d 1. c. 264, it was stated that, " * * * The controlling element is not whether it is a first bite but whether the dog has a vicious propensity for biting known to its keeper. On the other hand, the bare fact of a prior bite does not of itself establish the vicious propensity. The circumstances surrounding the occasion of the biting and its extent demonstrate whether the incident of the prior bite is sufficient evidence or some evidence of a vicious propensity of the dog to inflict injury." Similarly, in the case of Mitchell v. Newsom, supra, 360 S.W.2d 1. c. 251, this court pointed out the necessity for looking at the circumstances surrounding previous acts of the dog to determine whether there is sufficient evidence of a vicious propensity of the dog to inflict injury. In that case we held that it was not sufficient evidence to take a case to the jury where a child was bitten by a dog owned by the defendant and wherein other evidence showed that the dog barked violently at the trash man, jumped at a boy in the neighborhood and snapped at him. We held that this evidence, even though accepted as entirely accurate, fails to describe the circumstances under which it occurred with sufficient particularity as to be of any definite significance. We likewise believe that the evidence adduced by defendant Downs and his wife in this case

with respect to the statements of Callahan as to the alleged attacks by the collie in this case on some woman, even if assumed to be true, standing alone devoid of any evidence as to the circumstances giving rise to such occasion, is insufficient evidence to warrant a finding that this dog had vicious propensities for biting which were *known* to defendant Callahan.

We believe accordingly that plaintiff failed to make a submissible case against the defendant Callahan. Missing is a sufficient showing of knowledge on the part of Callahan of any vicious propensity of the dog to bite.

Plaintiff argues that the evidence was in conflict as to the ownership of the dog after Callahan delivered it to Downs. This is certainly true and that issue was for the jury. The jury could find under the evidence that Downs was a bailee or caretaker for Callahan with respect to the dog and in such a case any knowledge as to vicious propensities of the dog to bite which Downs acquired during the bailment would be imputable to Callahan. 4 Am.Jur.2d, Animals, § 87. Mrs. Downs, testifying for plaintiff, stated that the day after Callahan left the dog it bit Johnson, the hired man. This was disputed by her husband, Downs, who testified in his own behalf and who fixed the occasion after the biting of the plaintiff. Apparently plaintiff accepts defendant Downs' version because although pressed as he is to establish scienter on Callahan's part, nowhere in either his initial or reply brief does he refer to or undertake to rely on this testimony of his own witness. We place significance on this fact in rejecting this evidence for the purpose of imputing some constructive knowledge on Callahan of a vicious propensity of this dog to bite.

Because of the disposition we have made of this appeal, it is not necessary to determine whether the court properly sustained the motion for a directed verdict on the specific ground set forth in its order. For the reasons stated the order of the trial

court in sustaining defendant Callahan's motion for judgment in accordance with his motion for a directed verdict is affirmed. Cause remanded to the trial court for a new trial, if desired by plaintiff, against defendant Kenneth Downs.

ANDERSON, Acting P. J., and RUDDY, J., concur.

WOLFE, P. J., not participating.