**Sandra Lynn GARDNER, by Her Next Friend, Dorothy E. Gardner, Plaintiff-Respondent,**

v.

**Ralph M. ANDERSON, Defendant-Appellant.**

No. 24536.

Kansas City Court of Appeals.

Missouri.

April 3, 1967.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 5, 1967.

Application to Transfer Denied Sept. 11, 1967.

Jack G. Beamer, Robert J. Mann, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for appellant.

Lantz Welch, Kansas City, Quinn, Peebles & Hickman, Kansas City, of counsel, for respondent.

MAUGHMER, Commissioner.

Dog bite case. There was a verdict and judgment for plaintiff in the sum of $15,000, and defendant has appealed.

The occurrence took place about 8:00 p. m. on August 13, 1963. The plaintiff, Sandra Lynn Gardner, is a little girl and at the time was nine years old. She lived with her parents near Grandview and not far from the home of defendant Ralph M. Anderson. Sandra was riding her bicycle down the street in front of defendant's residence. She and her two young brothers stopped near the railroad tracks where they found some chalk or sheetrock and were "drawing on the street". She said they were joined by defendant's children; that they were all talking when Samantha, a female German Shepherd dog (three years old and weighing about 90 pounds) owned by defendant, "jumped up on me and bit me". Plaintiff said the dog bit her first on the face and then on the hip. Sandra denied that she had "teased" or "been mean to the dog". It was her testimony that the dog then went down the street and Mrs. Anderson (defendant's wife) came out. She said that a few days earlier the Anderson children had "sicced" the dog on her but she had not been molested at that time.

Sandra was taken to the Baptist Memorial Hospital in Kansas City, where she

was treated by Dr. R. E. Chandler, M. D., a plastic surgeon. He described her wounds as a laceration from the corner of the mouth, 1½ or 2 inches long, and another up the cheek approximately 2½ inches in length. The lower one was a through-and-through laceration, passing through all the layers of the soft tissues of the face. The teeth could be seen through the cut and the edges were ragged, jagged and torn. There were multiple punctuate wounds of the face with a laceration of the right cheek, lateral to the ear which was one inch in length. There were two wounds on the right buttocks, with abrasions over the knees and shins. The right angled tear on the mouth and cheek was repaired with five series of stitching. A sixth series of stitching was done around the lip. The wounds on the buttocks and in front of the ear were also stitched. The facial wounds were treated by surgery—plastic repair and reconstruction. Dr. Chandler last examined plaintiff on September 20, 1965, just over two years after the injury. At that time he found that the scars on the ear, cheek, eyelid and the right buttocks had "faded to a point to where they are not cosmetically objectionable". With reference to the other scar which he described as "L" shaped, he recommended further surgery to be done when she was about 14 years old. He said that even though such procedure were followed, the scar would in part remain.

We shall first summarize the evidence adduced by plaintiff in support of the proposition that prior to the occasion when plaintiff was bitten, the dog Samantha possessed dangerous and vicious propensities and defendant kept or harbored the dog after he had knowledge, actual or constructive, of such vicious propensities.

(1) Deputy Sheriff Robert White was offered as a witness, but except for the fact that he had removed the dog, his proffered testimony was wholly hearsay and was properly excluded by the trial court.

(2) Sandra Sue Hughes, 12 years old in 1965, at the time of trial, lived across the street from defendant in the year 1963. She testified that on one occasion she saw Samantha jump out of or through a window; that one day in the spring of 1963, she was visiting in defendant's home and watching television when the "dog started growling", "I bent down to pet the dog and the dog bit me on my nose". She was asked "Did the bite leave a mark on you?" Her answer was "No, sir". On cross-examination, she was asked: "But the question is, it really didn't bite you, did it?" Her answer: "I don't know". She said there was some blood on the bridge of her nose. She admitted ill feeling developed thereafter between her family and that of the defendant, but it did not arise out of this incident. Sandra received no medical attention because of this injury.

(3) Mrs. Charles P. Hughes, mother of Sandra, testified. She said the dog growled a lot" and defendant told them not to pet her too much. She said Sandra came home on the day the dog bit her, crying, and with her hand up to her mouth. Mrs. Hughes described how she washed or wiped the blood away, "that it was just a scratch, I guess, but the skin was broken". She said there was just one mark on the bridge of her nose and you couldn't tell from looking at it whether she had bumped into something or had been bitten.

(4) Mr. Charles P. Hughes, father of Sandra, stated that the defendant told him he was "training the dog to be a watch dog and for us not to pet him because he didn't want him to be friendly". He said he was working in his garage one day and the dog "came up and growled at me, so I just asked Andy if he would please keep the dog over there * * *".

(5) The plaintiff herself testified. She was eleven years old at the time of trial. In addition to describing the attack on August 13, 1963, she said that on two other occasions when she was riding her bicycle down the street she heard defendant's chil-

dren say to the dog: "Sic 'em, sic 'em" and then they grabbed her by the collar or fur so that she stayed in the yard. She said the dog never chased her. It was her testimony that she was kneeling and drawing with chalk on the road when Samantha suddenly attacked and bit her. She denied that she had teased the dog or thrown things at her. She recounted no misbehavior prior to the one when she was injured.

(6) On rebuttal, plaintiff produced the testimony of Mr. Arthur Stein, a stenotype reporter, who made notes when plaintiff's attorney interviewed Jenine McKinney, defendant's step-daughter. His testimony was that Jenine at that time told them that the dog once "snapped at a girl named 'Kim'".

There was no affirmative testimony that the incident where the dog either bit or bumped Sandra Hughes was called to the attention of the defendant, Robert M. Anderson. Neither Mr. Hughes, Mrs. Hughes nor Sandra ever told him, but Mrs. Hughes said she talked with Mrs. Anderson about it. Mrs. Anderson testified she did not remember if she did or did not tell her husband. The defendant said he first heard about it after the dog bit the plaintiff.

■ Defendant's evidence was to the effect that the dog had been provoked. The defendant's premises at the time were in a rural area and consisted of a small acreage. Frequently picnics were held there—by a boys' baseball team and other groups. The dog ranged freely on those occasions and no picknicker was attacked or bothered. However, in determining whether or not plaintiff made a submissible case and if defendant's motion for directed verdict should have been sustained, we must view the evidence in the light most favorable to plaintiff and we must accept plaintiff's evidence with all reasonable inferences deducible therefrom as true. Maxwell v. Fraze, Mo.App., 344 S.W.2d 262, 263, 265. We shall disregard defendant's evidence un-

less it aids plaintiff's case. Robidoux v. Busch, Mo.App., 400 S.W.2d 631.

■ In an action against the owner or harborer of a dog for injury inflicted by it, an essential element of the cause of action is defendant's actual or constructive knowledge of the vicious or dangerous propensities of the dog. Maxwell v. Fraze, supra, 344 S.W.2d page 264; Clinkenbeard v. Reinert et al., in Banc., 284 Mo. 569, 225 S.W. 667, 669, 13 A.L.R. 485. Mitchell v. Newsom, Mo.App., 360 S.W.2d 247 is a dog bite case. Plaintiff there was a child eight years old. The dog was allowed to run loose. There was evidence that he "barked at the trash man" and that about one week before plaintiff was bitten, the dog "jumped at" and "snapped at" a boy in the neighborhood. It was held plaintiff failed to make a submissible case.

This court (Patterson v. Rosenwald et ux., 222 Mo.App. 973, 6 S.W.2d 664, syllabus 1) stated:

"In Missouri, a cause of action based upon the harboring or keeping of a vicious dog is not grounded on negligence, but the gist of the action is the keeping of a vicious dog after knowledge of his vicious propensities, and action is founded upon the theory of maintenance of a nuisance rather than upon negligence".

Whether the fault be styled nuisance or negligence, the essence of the cause of action is the keeping of a vicious dog unrestrained, after knowledge, actual or constructive, of his vicious propensities.

■ In Humes v. Salerno, 351 S.W.2d 749, 752, our Supreme Court quoted with approval as follows from O'Neill v. Blase, 94 Mo.App. 648, 68 S.W. 764, 770:

"'It is not essential to the owner's liability that he should have notice of the particular sort of act which produces the injury by an animal in a case like this. He must not wait until his dog bites somebody before taking notice of his

dog's conduct, where it has been such as to warn a man of ordinary prudence that the animal is ferocious or vicious in disposition' ".

This Humes case had to do with a vicious stallion. There was ample evidence as to his vicious propensities. He would "fight in the gates", "tried to flip on me—fall over backwards". In the paddock he reared up and struck at the groom, tried to paw him with both feet. The horse "kicked back on me", he did a "sun fish" at the starting gate "twisted and dropped me and when I hit the ground he tried to savage me". He ran with his ears laid back, an indication that a horse is about to bite or "savage" in some other manner. He was mean. "The trainer and I (jockey) and the man who owns him, we didn't know what was wrong with him." The horse "went into a rage" and "nailed" plaintiff's right leg between his teeth, stumbled and "still had me in his mouth, on the ground, and growling like a lion". The acts of proved prior behavior showed viciousness and the court so ruled.

Plaintiff relies to a great extent on the decision of this court in Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066, which was decided in 1909. In that case the dog followed defendant's store delivery truck. The court summarized the evidence as to the vicious propensities of the dog and the actual injury of plaintiff as follows:

"Not only was he prone to attack dogs and other domestic animals without provocation, but on some of his excursions with the delivery wagon he rushed at people as though he intended to do them bodily harm. There is no proof that he ever bit a person, but he is depicted, in the evidence of plaintiff, as being a canine bully that delighted in terrifying people and animals with ferocious demonstrations. On August 10, 1907, plaintiff, then in a pregnant condition, was sitting on the front porch of her residence when the delivery wagon passed along the street. The dog was following the wagon, and, when opposite the premises of plaintiff, suddenly, and without provocation, charged at her. He jumped the front fence, rushed up on the porch, and jumped at plaintiff in a ferocious and terrifying manner. Plaintiff, greatly excited, managed to push him away with her arms. He fell, striking his breast on the edge of the porch, got up, ran over to an adjoining house, snapped at a woman standing on the porch of that house, and then suddenly turned and ran after the wagon".

In this Merritt case the court commented that under plaintiff's evidence the dog had "acquired the habit of assailing people with the appearance of ferocity and viciousness". The opinion on the question of notice, states:

"By showing, as she did, that the dog on a number of earlier occasions *attacked people without provocation*, she proved that the attack in question was the result of a fixed habit or propensity. In accepting plaintiff's evidence the jury were entitled to infer that defendant, who had harbored the dog a long time, knew of its vicious or mischievous habits and propensities". (Italics supplied).

In 3 C.J.S. Animals § 148, page 1249, the rule is set forth this way:

"Generally the owner of a domestic animal is under no obligation to guard against injuries which he has no reason to expect on account of some disposition of the individual animal different from the species generally if he has no notice of such disposition. Hence, if the injury has resulted from the exercise of a vicious propensity, which is not natural to the class of animals to which the offending animal belongs, the owner or keeper of the animal is usually not liable if he did not have previous knowledge or scienter of the vicious propensity".

For the latest decision of a Missouri appellate court on this type of case see Boyer v. Callahan et al., Mo.App., 406 S.W.2d 805, in which the same principles, which we

have herein recited, were reiterated and redeclared.

Among the contentions on appeal, defendant insists that he never learned about the Sandra Hughes incident until after the dog had bitten Sandra Gardner, and that the communication of that information to his wife, does not charge him with such knowledge. For the purpose of ruling on whether or not defendant's motion for directed verdict at the close of all of the evidence should be sustained, let us assume that the jury might be authorized to charge defendant with knowledge of everything contained in plaintiff's evidence, including all reasonable inferences deducible therefrom. From such a viewpoint, just what did plaintiff's evidence show? We believe it might be said to show the following, but no more.

First. The dog barked at people on various occasions.

Second. Once the dog jumped through a window—no further details or explanations were given.

Third. The dog growled on a few occasions.

Fourth. The dog chased children who were riding bicycles in front of defendant's house. She barked and snapped at the riders but never bit one.

Fifth. Once in defendant's living room Sandra Hughes, a girl 10 years old, who was sitting in a chair "reached down to pet him" and the dog either bit her on the nose or bumped her on the nose. The girl was not sure which. The injury (as described by her parents) was just a scratch, was gone the next day and there were no visible teeth marks, but the "scratch" had blood on it. It is difficult to reasonably conclude that a large dog, such as Samantha, could bite a person on the nose and leave no teeth marks, or any wound except a "scratch". Neither the child nor the parents asserted that she had been bitten. The testimony of plaintiff herself had to do almost entirely with the August, 1963 attack.

Sixth. The dog was allowed to roam freely and was present on defendant's five acre tract when small groups were picnicking, but no incidents of biting, or attacks or evidence of viciousness were shown to have occurred.

Seventh. The rebuttal testimony ascribed to Jenine McKinney, who allegedly said that upon one occasion the dog had snapped at a girl identified only as "Kim". There was no further evidence tending to indicate vicious behavior.

From this evidence could reasonable men conclude that this particular dog possessed vicious or dangerous propensities so as to require her owner, in the exercise of ordinary care, to keep the dog restrained or be liable in damages if she bit or attacked or injured some person? Does it show that she possessed a disposition different from her species generally and of vicious propensities? If the evidence presented is sufficient evidence under which reasonable men might conclude that the dog was possessed of vicious and dangerous propensities and that her owner, in the exercise of ordinary care, should not allow her to run loose so that she might have an opportunity to attack or injure or bite some person, then plaintiff presented a submissible case and defendant's motion for directed verdict was properly overruled. Otherwise, it was error to deny the motion.

 There is a common expression that a dog is entitled to one bite and after that his owner is liable for any future bites. This is not the law and is not supported by the decisions. It is not necessary for the dog to have bitten someone before if the evidence discloses vicious propensities, which could include assaults or threatened attacks without biting. In addition, the bare fact of a prior bite does not in and of itself establish the vicious propensity. The controlling element is whether the dog has been shown to have a vicious propensity for biting or for assault or other vicious behavior. Maxwell v. Fraze, 344 S.W.2d pages 264, 265, supra.

■ The plaintiff, a little girl, suffered real and serious injury. However, we reluctantly conclude, under the law of Missouri as declared in the opinions cited herein, that defendant was not negligent. Defendant could not have known that the dog had exhibited vicious propensities, for the simple and primary reason that under the evidence there was no proof showing any such propensities. Specifically, we rule that under the evidence presented, reasonable men could not conclude that, prior to the time plaintiff was bitten, the dog was possessed of vicious or dangerous propensities, so as to require defendant, in the exercise of ordinary care, to either restrain the dog or have her destroyed. This being so, we conclude that defendant's motion for directed verdict submitted at the close of the case should have been sustained, and that it was error not to do so. We believe that plaintiff failed to make a submissible case for the jury. The determination we have made on this point is decisive as to the case. It is not therefore necessary to consider the other assignments of trial errors.

The judgment for plaintiff is reversed and judgment for defendant is entered.

·SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.