Ruby May **FRAZIER**, Plaintiff-Respondent,

v.

Russell **STONE** and Freta Stone, his wife,
Defendants-Appellants.

No. 9704.

Missouri Court of Appeals,
Springfield District.

Dec. 23, 1974.

Albert C. Lowes, David G. Beeson, Buerkle, Buerkle & Lowes, Jackson, for defendants-appellants.

Lewis M. Blanton, Robison & Blanton, Sikeston, for plaintiff-respondent.

Before HOGAN, C. J., and TITUS, BILLINGS and FLANIGAN, JJ.

FLANIGAN, Judge.

Appellants Russell Stone and Freta Stone, husband and wife and defendants below, appeal from a judgment entered against them in the amount of $826.29, arising out of an incident which occurred on September 13, 1972, in which their dog bit Ruby May Frazier, plaintiff below and respondent here.

It is the principal contention of defendants that the plaintiff did not make a submissible case in that plaintiff failed to prove that the dog, Skipper, possessed a vicious propensity. Other contentions of defendants need not be considered because this court sustains their principal contention.

In determining the question of submissibility this court must consider the evidence in the light most favorable to the plaintiff, " ' . . . accepting as true all that is not entirely unreasonable or contrary to physical facts or natural laws and giving to plaintiff the benefit of all favorable inferences that reasonably may be drawn from such evidence. * * * But, of course, the case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis. In other words, liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence. * * * The question of whether the evidence in a given case is substantial is one of law for the court. * * *' Probst v. Seyer, Mo.Sup., 353 S.W.2d 798, 802, 91 A.L.R.2d 1252." The quoted language is repeated in Houghton v. Atchison, Topeka

& Santa Fe Railroad Co., 446 S.W.2d 406, 409 (Mo.banc 1969).[1]

■ The review of the evidence must be conducted in light of certain well established principles of dog law. In State v. Craig, 329 S.W.2d 804 (Mo.App.1959) this court, speaking through Judge Stone, said: "[I]n an action against the owner or harborer of a dog for injury inflicted by such animal, defendant's scienter (i.e., actual or constructive knowledge) of the vicious or dangerous propensities of the dog . . . is (except where removed by statute) an essential element of the cause of action and a necessary prerequisite to recovery . . . . As our Missouri courts have put it bluntly and succinctly in dog bite cases, 'the gist of the action is the keeping of a vicious dog after knowledge of his vicious propensities.'" State v. Craig, supra, 329 S.W.2d at 808–809.

■ In order for plaintiff to prove scienter it is necessary that the evidence show that Skipper in fact had vicious or dangerous propensities. Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667 (banc 1920); Maxwell v. Fraze, 344 S.W.2d 262 (Mo.App.1961). "Of course, the injury complained of must result from the exercise of the dangerous propensity. . . . It is not necessary for the dog to have bitten someone before if the dog has demonstrated a vicious propensity for biting. The controlling element is not whether it is a first bite but whether the dog has a vicious propensity for biting known to its keeper. On the other hand, the bare fact of a prior bite does not of itself establish the vicious propensity. The circumstances surrounding the occasion of the biting and its extent demonstrate whether the incident of the prior bite is sufficient evidence or some evidence of a vicious propensity of the dog to inflict injury." Maxwell, supra, 344 S.W.2d at 264.

■ The terms "vicious propensities" and "dangerous propensities" "generally have been defined as the tendency of a dog to injure persons, whether the dog acted out of anger, viciousness, or playfulness. Dansker v. Gelb, Mo.Sup., 352 S.W.2d 12." Bush v. Anderson, 360 S.W.2d 251, 256[13] (Mo.App.1962). "A 'vicious propensity' is not confined to a disposition on the part of the dog to attack every person he might meet, but includes as well a natural fierceness or disposition to mischief as might occasionally lead him to attack human beings without provocation." Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066 at 1069 (1909).

The plaintiff produced three liability witnesses. They were plaintiff herself, defendant Freta Stone, and Elma Gardner.

Plaintiff testified that she was sixty-five years old and lived in a house which she rented from the Richwood Methodist Church. The defendants were neighbors of plaintiff and plaintiff paid her rent to Mrs. Stone who collected it for the church. The plaintiff did not have a telephone and plaintiff occasionally had gone to defendants' house to use their telephone. On September 13, 1972, the day of the dog bite, plaintiff went there for that purpose. Skipper was a "pretty good size" cocker spaniel dog. On prior visits plaintiff had seen Skipper. Usually Skipper was in defendants' back yard and on a chain. In warm weather plaintiff had seen the dog a few times in a large fenced area but it was not there very long and plaintiff testified she had never seen Skipper "loose" before.

Before the day of the accident plaintiff had seen Skipper barking and lunging from the chain "when you get around where it could see you or a distance from you." Skipper did this when plaintiff "came around." "Most of the time whenever I would go there the dog would be doing that, barking and lunging." Plaintiff never did anything to provoke Skipper. Prior to the accident plaintiff had never been to defendants' home at night.

1. That the quoted rule is easier to state than to apply perhaps is demonstrated by the fact that four of the judges held that Houghton failed to make a submissible case and three dissenting judges thought otherwise.

On the accident date, at 6:30 or 7 p.m., plaintiff entered the premises of defendants. "I was going to call my daughter and I naturally—I was just going to go on up to the front, which I had been used to doing, and not expecting the dog to be loose, and just as I got over in the yard, you know, why, the dog come off of the steps and just come running its best, and when it got to me, it hit me, you know, just grabbed me all at once like that right on the leg, and so I knew they was home because I seen the light in the front room, and I went to hollering for them and the dog, when I hollered that—the first time when it hit me, I hollered, why, it just jumped back in front of me like it had me bayed, just sitting there, and I went to hollering for them, trying to get them to hear me, and I hollered several times, and so then Mrs. Stone, she opened the door, and as she come out on the steps, the dog left me and went to meet her, and just as she was coming along, the dog turned and got in front of her and was coming back, just like it was coming back to get me, running back towards me, and she was talking to it, and just as the dog got up at me, I was scared, and I said, 'Mrs. Stone.' She said, 'What is the matter?' and I said, 'Your dog has bit me,' and I said, 'It's going to get me,' and getting right up at me, and she kept talking to it and she got it checked, . . . "

Immediately following the infliction of the bite, Mrs. Stone took the plaintiff into the home of the defendants for first aid. According to plaintiff, at that time defendant Russell Stone said, "Well, I been aiming to get rid of that dog, it won't bite nobody else."

When asked why the dog had bitten her the plaintiff responded, "All I know it wanted to bite."

On cross-examination the plaintiff admitted that she didn't "know anything about the dog biting or offering to bite anybody before."

■ Although plaintiff's evidence was not confined to her own testimony, the latter invites comment. The fact that the plaintiff herself was attacked does not, per se, justify indulging the presumption that the attack was the result of a vicious propensity or that the defendants should have anticipated the occurrence. Merritt v. Matchett, supra, 115 S.W. 1066, 1068. Barking, running loose, jumping, and lunging are activities in' which all dogs engage and, absent further showing, do not alone justify a finding of vicious propensities. Mitchell v. Newsom, 360 S.W.2d 247 (Mo. App.1962). The same is true of jumping at or scaring people where there is no evidence of any propensity of the dog to bite or otherwise harm people. Boyer v. Callahan, 406 S.W.2d 805 at 810 (Mo.App.1966). The use of a dog chain is not in itself evidence of a dog owner's knowledge of a dog's vicious propensity. Mitchell v. Newsom, supra, 360 S.W.2d 247. To hold otherwise "would place the dog owner in an impossible position of not knowing whether to restrain or let his dog run loose. There is no obligation to restrain until the duty is evident as shown by all of the reported cases." Mitchell, supra, 360 S.W.2d at 251.

■ The statement attributed to defendant Stone does not, alone or in conjunction with the other evidence, constitute proof of a vicious propensity. Plaintiff, a lady of obvious veracity and of misfortune, did not testify that she understood the statement to refer to a prior bite nor may this court read, even by inference, such a meaning into it. Though not binding on the plaintiff, Mr. Stone later testified that he had intended to get rid of Skipper because his wife had arthritis and could not care for the dog.

■ Plaintiff called defendant Freta Stone as a witness. In so doing, plaintiff bound herself by that portion of Mrs. Stone's testimony which was uncontradicted or was the only evidence on a point, [Taylor v. Riddle, 384 S.W.2d 569 (Mo. 1964) ], and, within the foregoing limits, plaintiff was bound only by that portion of the testimony of Mrs. Stone which plaintiff offered and was not bound by the tes-

timony of the witness elicited on cross-examination by her own counsel. Taylor, supra, 384 S.W.2d 569.

■ Mrs. Stone admitted that she might have told the plaintiff that she thought Skipper had bitten plaintiff because Skipper thought plaintiff was Mrs. Gardner. When asked whether the dog and Mrs. Gardner had problems, the defendant stated that Mrs. Gardner did not have any problems but the dog did. Mrs. Gardner had a long walking stick with a nail in the end of it "that she punched at the dog with." When Mrs. Gardner would hit the dog it would rear up on the fence.[2] But the defendant further testified, on direct examination, that Skipper's "dealings" with Mrs. Gardner took place when Skipper was not over three or four months old, "when he was a young puppy", and it did not happen later. Skipper was two to two and one-half years old at the time plaintiff was bitten. Mrs. Stone testified that as far as she knew Skipper never offered to bite anybody "other than Mrs. Gardner jabbing the dog." On direct examination Mrs. Stone was asked whether ill feeling existed between Mrs. Gardner and Skipper and, referring to Mrs. Gardner hitting Skipper, said "nothing only without that produced the ill feeling."

Further, on direct examination, defendant testified that her arthritic condition caused defendants to get rid of Skipper after the occurrence and that they had decided to get rid of Skipper earlier in the year for that reason.

Because plaintiff places her greatest reliance upon the testimony of Elma Gardner to support her contention of submissibility, it is necessary to set forth that testimony in some detail. It follows:

Q. Did you ever observe the dog owned by Mr. and Mrs. Stone?

A. Yes, I have seen Mrs. Stone's little dog. I thought it was pretty. . . . I loved it.

Q. What did you observe about it? What did you see the dog do, if anything?

A. Well, it come across the road after me one day and I backed plumb up agin the fence, but he was just determined he's going to sit down in front of me.

Q. All right. You say across the road. What road are you talking about?

A. Uh-huh, and I had my walking cane so I just set it down and I thought if if he wanted to chew on anything he could chew on that walking cane.

Q. All right, and where were you when the dog came out?

A. I was on the lefthand side of the road right behind Mrs. Stone's mailbox. I just backed up there to get out of its way in the fence, you know, where it couldn't—little dogs like to creep up on you, if you will.

Q. When was this?

A. Oh, I don't remember just when it was, but it was right after I had a stroke and—and it was the first time that I got out and tried to walk any. My doctor told me to try to walk.

Q. Was this before or after the Stones' dog bit Mrs. Frazier?

A. It was before. . . .

Q. Was Mrs. Stone home when the dog came out this time?

A. Yes, and she came out and got him. . . . And took him in and he jerked loose from her. He is pretty strong. . . . And he come right

---

**2.** Even if a prior bite had resulted, where the evidence shows the prior bite was a result of provocation or by its nature was not vicious, the prior bite is insufficient to establish vicious propensities. Sayers v. Haushalter, 493 S.W.2d 406 at 408 (Mo.App.1973) (citing authorities).

back and so I was talking to this dog. I wasn't—I didn't mean him no harm. I think Freta should know that. I think I was talking to him and I said, "If your mama don't take you home I am going to whip you good directly. I am going to slap you plumb across the road," and he looked at me like he said, "You will do what?"

Q. . . . Did you see him more than one time before Mrs. Frazier was bit?

A. I think I saw him twice.

Q. What was he like then?

A. He just like any other dog. I started to go around through the garden to go over to Mrs. Kenzie, a neighbor that lived over there, and he would run along the fence and bark and bark and bark and I would talk to him, and bark and bark until he get down to where he knew he couldn't get out, and then he would turn around and go back. He didn't want to get out.

Q. Did you ever provoke this dog?

A. No, I never did. I had to have my walking cane with me and I am pretty sure he knew I wasn't going to hurt him with that cane.

Q. But you didn't—did I also understand you to say you didn't particularly worry about the little dog because he was like all other little dogs. Did you think that was a mean and vicious dog?

A. All dogs mean and vicious when they want to do something.

Q. Was this little cocker spaniel—was he mean and vicious, you figure?

A. No, I didn't think so. I thought Freta knew more than that. We

have been neighbors for years. Those are my neighbors and I love them. I don't know how this come about. I never have knowed, but I would like to find out. Freta, I wouldn't hurt your little dog. He might have been afraid of my cane.

THE COURT: Just wait until they ask you questions.

Q. (By Mr. Lowes) Mrs. Gardner, you figured the dog could have been afraid of your cane is why he may have barked a little more at you and run at it?

A. He might have been afraid. I don't know. He couldn't talk and tell me, wasn't no use in me asking.

Q. You weren't scared of the dog? You didn't figure he was a mean and vicious dog or anything like that?

A. All I ever said to Mrs. Frazier was, I said, "You better watch him," I said, "Because he is liable—seemed like he mostly wants you to pay attention to him than anything."

Q. Like all dogs he liked to be petted and talked to, is that right?

A. In a way he was a guard dog.

Portions of the foregoing testimony could be singled out in defense of the conduct of the dog.[3] They include Mrs. Gardner's statements that the dog "was just determined he is going to sit down in front of me"; "he was just like any other dog"; "he might have been afraid of my cane"; "seemed like he mostly wants you to pay attention to him than anything." When asked whether or not Skipper was mean and vicious, Mrs. Gardner (who was the owner of three dogs, including one which she had had for fourteen years) replied "No, I didn't think so." These excerpts from Mrs. Gardner's testimony sapped much of its vitality, but the balance of her

---

3. According to the *uncontradicted* testimony of Mrs. Stone, when she testified for plaintiff, the "dealings" with Mrs. Gardner took place at least one and one-half years prior to the date Skipper bit the plaintiff.

testimony, considered in its totality, fails to paint a picture of a dog manifesting a vicious or dangerous propensity to injure. The "dealings" with Mrs. Gardner could hardly induce a reasonable person, whether or not an owner or lover of dogs, to feel constrained to destroy Skipper or to make certain that he was at all times restrained.[4]

██ Nor is this court unmindful of the final statement of Mrs. Gardner "In a way he was a guard dog." That statement was not elaborated upon and the manner in which it was worded may imply that Skipper fell somewhat short of being a watch dog. Nor is it necessary to explore the meaning of watch dog. It may be that a dog could be a watch dog and still permit persons, known by him in the past to have visited his master's premises, to enter without incident. As the excellent brief of plaintiff points out, there is language in Speckmann v. Kreig, 79 Mo.App. 376 (1899) at p. 381 to this effect: "The fact that a dog is kept as a watch dog (as this one was) and is kept tied in the day and turned loose at night, is notice to his master that he is dangerous." That statement, among others, is quoted in Clinkenbeard v. Reinert, supra, 225 S.W. 667 at 668. It seems to have been questioned, at least tacitly, in Mitchell v. Newsom, supra, 360 S. W.2d 247 at 251 [6]. A statement that a dog was "in a way a guard dog," without more, is insufficient to support a finding that such a dog is one of vicious propensity.

This court has reviewed the evidence offered by defendants to determine whether it aids plaintiff on the submissibility issue. It does not.

In some of the cases brought by dog-bitten plaintiffs, the evidence has been held to be sufficient[5] to support an award in their favor. In other such cases the evidence has been held to be insufficient[6] to do so. Of course the submissibility question must be resolved on a case by case basis. Although the principles of dog law may be well established, no two cases are alike.

In a dog bite case the line of demarcation between submissibility and nonsubmissibility is a fuzzy one. It involves a reasonable accommodation of the right of persons to be free from the risk of exposure to animals known to be vicious and the right of dog owners to have some degree of freedom in the possession and enjoyment of their canine pets.

The evidence in this case, viewed in its entirety, is not as strong as that offered by the plaintiffs in the cases cited in Footnote 5. Moreover, the evidence here is not as strong as that in Gardner v. Anderson, 417 S.W.2d 130 (Mo.App.1967) or in Boyer v. Callahan, 406 S.W.2d 805 (Mo.App.1966), where rulings of nonsubmissibility were made.

██ Applying the rule set forth in the third paragraph of this opinion, this court holds that the evidence is insufficient to support the verdict and judgment and the latter is accordingly reversed.

Judgment reversed.

All concur.

4. In Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667 at 670 [4] (banc 1920) it is said that when the dog owners were advised of the vicious propensities of a dog "it became their absolute duty, for the protection of the public, to either kill or safely restrain the dog."

5. Sayers v. Haushalter, 493 S.W.2d 406 (Mo. App.1973) ; Boosman v. Moudy, 488 S.W.2d 917 (Mo.App.1972) ; Dansker v. Gelb, 352 S.W.2d 12 (Mo.1961) ; Brune v. DeBenedetty, 261 S.W. 930 (Mo.App.1924) ; Clinkenbeard v. Reinert, 284 Mo. 569, 225 S.W. 667 (banc 1920) ; Carrow v. Haney, 203 Mo. App. 485, 219 S.W. 710 (Mo.App.1920) ; Merritt v. Matchett, 135 Mo.App. 176, 115 S.W. 1066 (Mo.App.1909) ; Speckmann v. Kreig, 79 Mo.App. 376 (1899).

6. Gardner v. Anderson, 417 S.W.2d 130 (Mo. App.1967) ; Boyer v. Callahan, 406 S.W. 2d 805 (Mo.App.1966) ; Mitchell v. Newsom, 360 S.W.2d 247 (Mo.App.1962) ; Maxwell v. Fraze, 344 S.W.2d 262 (Mo.App.1961) ; Staetter v. McArthur, 33 Mo.App. 218 (1888).